UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WESCO INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>BRAD INGRAM CONSTRUCTION,<br><br>Defendant. | Case No. 21-cv-05682-WHO<br><br>**ORDER GRANTING IN PART AND DENYING IN PART CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 20, 22 |

Before me are cross-motions for summary judgment on a single issue: whether plaintiff Wesco Insurance Company ("Wesco") owes a duty to defend Brad Ingram Construction ("Ingram") against a lawsuit arising from the cleanup of the 2018 Camp Fire. The central question is the applicability of the pollution exclusion provision in Ingram's insurance policy. The toxic dust left behind by the wildfire falls within the policy's definition of "pollutant." It was released when workers loaded and unloaded debris into the truck that hauled it out of the burn zone. Given the heavy regulation of the cleanup effort evidenced by the hazardous materials gear worn by those involved, a reasonable layperson would consider the release of toxic dust in this context to be environmental pollution. The underlying matter thus falls within the pollution exclusion provision, meaning that Wesco does not owe a duty to defend. Wesco's motion for summary judgment is GRANTED; Ingram's is DENIED.

**BACKGROUND**

**I.    FACTUAL BACKGROUND**

The events giving rise to this litigation trace back to the devastating Camp Fire that destroyed the city of Paradise, California, killing dozens of people and razing thousands of buildings in its path. The fire left behind millions of pounds of toxic debris, prompting the state of

California to embark on a massive cleanup effort. *See* Wesco Mot. for Summ. J. ("Wesco MSJ") [Dkt. No. 20] 1:23-25. The California Department of Resources, Recycling, and Recovery ("CalRecycle") hired Ceres Environmental Services ("Ceres") as one of three prime contractors coordinating the cleanup of unincorporated areas outside of Paradise. *See id*. at 5:4-9. In turn, Ceres hired different subcontractors to carry out the work, including Garlow Transport ("Garlow"), a trucking company. *Id*. at 1:26-27. A Garlow employee named Richard Vargas worked on the project during the summer of 2019, driving "hundreds of loads of debris from work sites to hazardous waste dumps." *Id*. at 1:27-2:1.

Vargas alleges that "because the debris was known to be a health hazard," CalRecycle "recognized that the nature of the material being handled at the cleanup required added emphasis on safety." *See* Stipulation ("Stip.") [Dkt. No. 21], Ex. B ("Vargas Compl.") ¶ 15.[1] Specifically, Vargas contends that CalRecycle recognized "the potential that toxins could become airborne during debris removal." *Id*. ¶ 16. As a result, CalRecycle conducted safety daily meetings, required decontamination zones where workers suited on and off, and set up air monitoring stations to monitor for airborne toxins. *Id*. ¶¶ 15-16. It also "had an expectation that on-site crews would wear the proper safety equipment." *Id*. ¶ 15.

Over the summer, Vargas drove to the site, where workers loaded debris into his truck, stirring up clouds of dust that entered the vehicle through its ventilation system. *Id*. ¶ 22. Once the truck was loaded, Vargas stepped into the dust in order to tarp the load before driving it to the designated waste facility. *Id*. ¶ 23. Once there, Vargas would get out of the truck, remove the tarp, and dump the load, again exposing him to the dust. *Id*. Although the on-site workers who loaded Vargas's truck wore hazardous material suits and respirators, Vargas was not provided nor told that he needed "any type of respiratory protection." *Id*. ¶ 22.

Over the course of the summer, Vargas became ill. In the fall of 2019, he was "unexpectedly diagnosed with sarcoidosis, a disabling immune disease linked to exposure to

---

[1] Wesco and Ingram stipulated to the admissibility, authenticity, and foundation of several documents for the purposes of determining their cross-motions for summary judgment, including the insurance policy at issue, Vargas's complaint, Ceres's cross-complaint, and correspondence between Ingram and Wesco regarding the Vargas lawsuit. *See* Dkt. No. 21.

environmental toxics." *See id*. ¶ 3. Before this diagnosis, Vargas "had never previously had any similar type of health problem." *Id*. ¶ 25.

Vargas sued Ceres and CalRecycle in August 2020, alleging that they did not protect him from the "clouds of toxic dust" during the loading and unloading of his truck in part by failing to provide any respiratory protection, take steps to suppress the dust, or warn of the need to avoid such exposure. *See id*. ¶¶ 32, 40, 50. As a result, Vargas alleges, he was exposed to harmful levels of toxic dust that caused his sarcoidosis. *Id*. ¶¶ 33, 41, 53.

On September 30, 2020, Ceres filed a cross-complaint against Garlow and another subcontractor, Ingram, seeking indemnity for the damages sought by Vargas. *See* Stip., Ex. C ¶ 8. The cross-complaint did not raise new allegations; rather, it relied on those made in Vargas's initial complaint, which it attached as an exhibit. *See id*. ¶ 9.

On December 8, 2020, Ingram tendered the cross-complaint to Wesco, its insurer. *See* Stip., Ex. D. On January 15, 2021, Wesco sent Ingram a letter disclaiming its duty to defend, in part asserting that the matter fell within the policy's "total pollution exclusion endorsement." Stip., Ex. F. Ingram challenged the disclaimer, which Wesco later affirmed. Stip., Exs. G, H.

**II.   THE POLICY**

Wesco issued a commercial general liability insurance policy to Ingram, effective from April 1, 2019, through April 1, 2020. Stip., Ex. A ("Policy") at 161.[2] The provisions relevant to the motions at hand are as follows:

Coverage A states that Wesco

> will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. [Wesco] will have the right and duty to defend the insured against any "suit" seeking those damages. However, [Wesco] will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

*Id*. at 043.

The policy defines "bodily injury" as "bodily injury, sickness or disease sustained by a

---
[2] The page numbers reference the Bates numbers.

3

person, including death resulting from any of these at any time." *Id*. at 055.[3] But the policy excludes coverage of

> "[b]odily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

*Id*. at 081 (modifying the standard pollution exclusion language at 045).[4] It defines "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed." *Id*. at 057.

### III.  PROCEDURAL BACKGROUND

Wesco filed this lawsuit on July 23, 2021, seeking declaratory judgment that it owed no duty to defend or indemnify Ingram against the cross-complaint. *See* Dkt. No. 1. The parties agree that the sole issue presented in the litigation was "whether Wesco's pollution exclusion bars coverage, and thus exempts Wesco from a duty to defend the Vargas lawsuit." *See* Wesco MSJ at 8:1-3 (citing Dkt. No. 12); Ingram MSJ at 7:6-7.

In April and May of 2022, the parties filed cross-motions for summary judgment on this question. *See* Dkt. Nos. 20, 22. I heard arguments from the parties on June 8, 2022.

### LEGAL STANDARD

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify

---

[3] The parties agree that, as alleged, Vargas suffered a "bodily injury" implicating Coverage A. *See* Wesco MSJ at 8:21-23; Ingram Mot. for Summ. J. ("Ingram MSJ") [Dkt. No. 22] 3:8-10.

[4] I will refer to this as "the pollution exclusion."

4

1  "specific facts showing there is a genuine issue for trial." *Id.* at 324.  The party opposing
2  summary judgment must then present affirmative evidence from which a jury could return a
3  verdict in that party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257 (1986).

4  On summary judgment, the court draws all reasonable factual inferences in favor of the
5  non-movant. *Id.* at 255.  In deciding a motion for summary judgment, "[c]redibility
6  determinations, the weighing of the evidence, and the drawing of legitimate inferences from the
7  facts are jury functions, not those of a judge." *Id.*  However, conclusory and speculative testimony
8  does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See
9  Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979).

## DISCUSSION

An insurer's duty to defend is "broader than the duty to indemnify"; it "may owe a duty to defend its insured in an action in which no damages ultimately are awarded." *Montrose Chem. Corp. v. Superior Court*, 6 Cal. 4th 287, 295 (1993) (citation omitted).  Whether an insured owes such a duty is "assessed at the very outset of the case" by comparing the complaint's allegations and the policy's terms. *See Hartford Cas. Ins. Co. v. Swift Distrib., Inc.*, 59 Cal. 4th 277, 287 (2014).  The duty also exists "where extrinsic facts known to the insurer suggest that the claim may be covered." *Id*. (citation omitted).  "[T]he existence of a duty to defend turns not upon the ultimate adjudication of coverage under its policy . . . but upon those facts known by the insurer at the inception of a third-party lawsuit.  Hence, the duty may exist even where coverage is in doubt and ultimately does not develop." *Montrose*, 6 Cal. 4th at 295 (citation and quotation marks omitted).

"While the duty to defend is broad, it is not unlimited; it is measured by the nature and kinds of risks covered by the policy." *Swift*, 59 Cal. 4th at 288 (citing *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 19 (1995)).  An insurer and insured have different burdens when seeking declaratory relief regarding a duty to defend. *Id*.  As the California Supreme Court has stated:

> To prevail, the insured must prove the existence of a *potential for coverage*, while the insurer must establish *the absence of any such potential*.  In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot*.

5

*Montrose*, 6 Cal. 4th at 300 (emphasis in original).

"Interpretation of an insurance policy is a question of law and follows the general rules of contract interpretation." *MacKinnon v. Truck Ins. Exch.*, 31 Cal 4th 635, 647 (2003) (citing *Waller*, 11 Cal. 4th at 18). Under California law, the parties' mutual intention at the time the contract is formed governs interpretation. *See* Cal. Civ. Code § 1636. To determine this intent, "[t]he rules governing policy interpretation require us to look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it." *Waller*, 11 Cal. 4th at 18. Courts consider the "clear and explicit meaning of these provisions, interpreted in their ordinary and popular sense, unless used by the parties in a technical sense or a special meaning is given to them by usage." *Swift*, 59 Cal. 4th at 288 (citation and quotation marks omitted). Courts "must also interpret the language in context, with regard to its intended function in the policy." *Id*. (citation omitted).

Courts have grappled with pollution exclusions similar, if not identical, to the one at hand. The California Supreme Court thoroughly explained the history and varying interpretations of such exclusions in one of the state's seminal cases on the issue, *MacKinnon*. *See* 31 Cal. 4th at 643-47. Courts in California have considered pollution exclusions in the context of pesticides sprayed at apartment buildings, silica dust created during sandblasting operations, asbestos disturbed during the scraping of "popcorn" ceilings, dirt and rocks placed in creek beds, and chemicals that seeped into groundwater. *See, e.g., id.* at 639; *Garamendi v. Golden Eagle Ins. Co.*, 127 Cal. App. 4th 480, 483 (2005); *The Villa Los Alamos Homeowners Ass'n v. State Farm Gen. Ins. Co.* ("*Villa Los Alamos*"), 198 Cal. App. 4th 522, 527 (2011); *Ortega Rock Quarry v. Golden Eagle Ins. Co.*, 141 Cal. App. 4th 969, 979-80 (2006); *California v. Allstate Ins. Co.*, 45 Cal. 4th 1008, 1016 (2009).

The parties have not pointed me toward any case law interpreting such an exclusion's applicability to injuries allegedly arising from toxic matter left behind by a wildfire. But the law that does exist points to three primary issues. First, is the toxic dust that allegedly caused Vargas's sarcoidosis a "pollutant" as defined by the policy? Second, was his injury caused by the pollutant's "release" or "dispersal"? Third, do the allegations amount to an "act of pollution,"

6

which is covered by the exclusion, or an "ordinary act[] of negligence involving toxic chemicals," which is not. *See MacKinnon*, 31 Cal. 4th at 639, 654. I address each in turn.

## I. "POLLUTANT"

Vargas alleges that he was exposed to "clouds of toxic dust" during the loading and unloading of the debris that he hauled away from the Camp Fire site, and that he developed sarcoidosis from that exposure. *See, e.g.*, Vargas Complaint ¶¶ 32-33, 41.[5] The first question is whether that toxic dust is a "pollutant" as defined by the insurance policy.

The policy defines a "pollutant" as "any solid . . . irritant or contaminant, including . . . waste." Wesco MSJ at 9:9-14. Wesco asserts that toxic dust is undeniably a pollutant.

Ingram contends that "waste" means sewage, pointing to the California Court of Appeal's interpretation of the term used in an identical pollution exclusion in *Griffin Dewatering Corporation v. Northern Insurance Company of New York*, 176 Cal. App. 4th 172, 204 (2009). *See* Ingram MSJ at 19:7-12. Moreover, it argues that the final sentence of the definition—"Waste includes materials to be recycled, reconditioned or reclaimed"—signals that "'waste' refers to 'industrial byproducts,' not organic matter that might have caused contamination," such as dust and debris created by a natural event *Id*. at 19:14-20.

But the toxic dust need not be "waste" to be a pollutant. The policy defines "pollutants" as "*any* solid, liquid, gaseous or thermal irritant or contaminant, *including* smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." Policy at 057 (emphasis added). "Any" is ordinarily understood to be an expansive term; the Merriam-Webster dictionary defines it as "one or some indiscriminately of whatever kind" or "unmeasured or unlimited in amount, number, or extent." *Any*, Merriam-Webster, https://www.merriam-webster.com/dictionary/any (last visited June 14, 2022). And the word "including" does not limit pollutants to "waste"—or any other matter on the list. "Including" is generally not understood to be a limiting term, nor is it defined as one. Merriam-Webster defines "include" as "to take in or comprise as part of a whole or group."

---

[5] The parties do not dispute that because Ceres's cross-complaint included no new allegations and instead attached Vargas's complaint as an exhibit, the allegations within Vargas's complaint are relevant to the motions at hand. *See* Wesco MSJ at 7:2-11; Ingram MSJ at 5:24-6:2.

*Include*, Merriam-Webster, https://www.merriam-webster.com/dictionary/include (last visited June 14, 2022). In this context, a layperson would understand the word as indicating some (but not all) examples of pollutants—a non-exhaustive list of solid, liquid, gaseous or thermal irritants or contaminants. Importantly, she would understand, based on the word "including," that the list did not exclude other matters—for example, dust.

*MacKinnon* cautions courts not to be held hostage by the dictionary definitions of key terms in the pollution exclusion, however. *See* 31 Cal. 4th at 649 ("Although examination of various dictionary definitions of a word will no doubt be useful, such examination does not necessarily yield the 'ordinary and popular' sense of the word if it disregards the policy's context."). It instructs the court to "put itself in the position of a layperson and understand how he or she might reasonably interpret the exclusionary language." *Id*.

A layperson would interpret "toxic dust" to be an irritant or contaminant. Dust on its own can irritate a person or contaminate an area; allegedly toxic dust even more so. This reading is supported by other California courts that also recognized dust as a pollutant as defined by pollution exclusions. *See, e.g., Cold Creek Compost, Inc. v. State Farm Fire & Cas. Co.*, 156 Cal. App. 4th 1469, 1486 (2007) (holding that dust from a compost facility that spread to area homes was a pollutant); *Garamendi*, 127 Cal. App. 4th at 485-86 (holding that silica dust fell within the "broad definition of 'any solid, liquid, gaseous, or thermal irritant or contaminant'" and was identified in federal regulations as an air contaminant).

Considering the policy exclusion's expansive language, the general understanding of dust as an irritant or contaminant, and other courts' interpretation of dust as a pollutant, in this context a layperson would understand toxic dust to be a pollutant as defined by the policy.[6]

---

[6] Ingram also argues that the pollution exclusion does not apply because sarcoidosis may be caused by factors other than chemical exposure, such as bacteria, viruses, or genetics. *See* Ingram MSJ at 13:1-14:12 (citing Barnum Decl., Ex. A). But an insured "may not trigger the duty to defend by speculating about extraneous 'facts' regarding potential liability." *Gunderson v. Fire Ins. Exch.*, 37 Cal. App. 4th 1106, 1114 (1995). As alleged, Vargas was in "excellent health" before he worked on the cleanup project, and developed sarcoidosis as a result of the dust exposure. *See* Vargas Compl. ¶¶ 3, 33, 41. Ingram cannot speculate otherwise. Even if the dust exposure only partially caused Vargas's sarcoidosis, the pollution exclusion applies to bodily injury "which would have not occurred in whole *or part* but for" the alleged "discharge, dispersal, seepage, migration, release or escape" of a pollutant. *See* Policy at 081.

## II.     "RELEASE"

The next question is whether Vargas's injury was caused by the "actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape" of that toxic dust. *See* Policy at 081.  The parties focus on two of those actions: "release" and "dispersal."  *See* Wesco MSJ at 9:15-16; Ingram MSJ at 16:4-9.

Two cases are particularly helpful here.  *MacKinnon* examined "release" in the context of pesticides sprayed at an apartment building.  31 Cal. 4th at 639-40.  The court first turned to the Webster's Dictionary definition: "the act of liberating or freeing: discharge from restraint."  *Id*. at 650.  It determined that the word "release" (and "escape," which was also at issue) "connote some sort of freedom from containment" and that it "would be unusual to speak of the normal, intentional application of pesticides as a 'release' or 'escape' of pesticides."  *Id*. at 651.

In *Villa Los Alamos*, the question was whether asbestos was "released" during the scraping of acoustical "popcorn" ceilings in an apartment building.  198 Cal. App. 4th at 527.  The Court of Appeal held that it was, writing that a reasonable insured would understand a release to occur when "the scraping of acoustical ceiling material freed asbestos from containment" and the asbestos "became airborne and spread" throughout the building and onto its exterior grounds.  *Id*. at 540.  The court noted that widespread dispersal was not necessary for a release to occur, as there was "no safe level of exposure to asbestos."  *Id*.

Ingram's overarching argument is that in order for a pollutant to be released, it must move from a contained to uncontained state under *MacKinnon*, and because the toxic dust was never contained, it could not be released.  *See* Ingram MSJ at 19:23-20:15.  It points to various dictionary entries defining "contain" as to "confine" or "have within," and "containment" as "the act of containing: restraint, constraint, control."  Ingram Reply [Dkt. No. 26] 2:1-3:5.  According to Ingram, there was no such restraint, constraint, or control of the toxic dust, as it was "free-standing on open ground" until the removal work began.  *See* Ingram MSJ at 16:4-7.

Wesco points to *Villa Los Alamos* to argue that the toxic dust was released because it was disturbed during the cleanup operation.  *See* Wesco MSJ at 9:21-10:1.  According to Wesco, the toxic debris "was going nowhere absent massive cleanup operations."  *See* Wesco Reply [Dkt. No.

9

25] 8:1-4.  It then argues that the dust was a byproduct of that debris "and thus by definition had been contained within the mountains of removed debris." *Id*. at 8:4-7.

The underlying allegations mirror the release of the asbestos in *Villa Los Alamos*.  Vargas contends that as workers loaded debris into his truck, "they stirred up clouds of dust, which then came into [his] truck through its ventilation system."  Vargas Compl. ¶ 22; *see also* ¶ 24 (describing "the dust clouds created during the loading of [his] truck").  Moving the debris is akin to scraping the ceiling; both caused the pollutant at issue to become airborne and spread.  In *Villa Los Alamos*, the asbestos spread inside and around the apartment building.  198 Cal. App. 4th at 540.  At the work site, the toxic dust spread around and inside Vargas's truck.  Vargas Compl. ¶ 23.  Moreover, like the asbestos in *Villa Los Alamos*, the allegations in Vargas's complaint indicate that there was no safe level of exposure to the toxic dust, as shown by the protective gear that workers wore and air monitoring stations located around the worksite.  *See id*. ¶¶ 15-16.

Ingram looks to *MacKinnon,* but the dictionary definitions that Ingram offers are not dispositive.  Whether the dust was contained within the debris or sitting on top of it is a distinction without a difference—moving the debris (and thereby causing the dust to become airborne and spread) allegedly caused Vargas's injury, as did scraping the ceiling (and thereby causing the asbestos to become airborne and spread) in *Villa Los Alamos*.  Accordingly, a layperson would consider the toxic dust "released" as alleged in Vargas's complaint.[7]

### III. "ACT OF POLLUTION"

The critical question set forth in *MacKinnon* is whether the alleged injury arises from an event "commonly thought of as pollution"—i.e., "environmental pollution" or an "act of pollution."  *See* 31 Cal. 4th at 653-54.  The *MacKinnon* court drew a distinction between injuries resulting from environmental pollution, which fall within pollution exclusions, and "ordinary acts of negligence involving toxic chemicals," which do not.  *See id*. at 639.  Otherwise, the court held,

---

[7] Because the dust was released as required to trigger the pollution exclusion, I need not determine whether it was also dispersed.  The exclusion requires only one of the causal mechanisms be present.  *See* Policy at 081 (listing the "actual, alleged or threatened discharge, dispersal, seepage, migration, release *or* escape of 'pollutants' at any time") (emphasis added).

the literal reading of pollution exclusions could yield absurd and unreasonable results. *See id*. at 650. It offered some examples:

> The application of iodine onto a cut through an eyedropper may be literally characterized as a discharge or release of an irritant. . . . A child's accidental ingestion of a pesticide or other toxic substance negligently left in an empty soft drink bottle would be barred. Yet few if any would think of these injuries as arising from "pollution" in any recognizable sense of that term.

*Id*. The court further noted that the terms "discharge, dispersal, release or escape," when used alongside "pollutant," "commonly refer to the sort of conventional environmental pollution at which the pollution exclusion was primarily targeted." *Id*. at 653. In order to determine whether a pollution exclusion applies—whether the injury arose from environmental pollution or an ordinary act of negligence involving a harmful substance—the court "must attempt to put itself in the position of a layperson and understand how he or she might reasonably interpret the exclusionary language." *See id*. at 649.

*MacKinnon* acknowledged that "terms such as 'commonly thought of as pollution,' or 'environmental pollution,' are not paragons of precision, and further clarification may be required." *Id*. at 654. In evaluating the case at hand, the court admitted that "pesticides may be pollutants under some circumstances." *See id*. However, it ultimately concluded that the pollution exception did not apply, as a reasonable policyholder would not think that the "normal application of pesticides around an apartment building in order to kill yellow jackets," although negligent, was an act of pollution. *See id.*

In *Villa Los Alamos*, the Court of Appeal held that releasing asbestos by scraping ceilings was not akin to an "ordinary" act of spraying pesticides. 198 Cal. App. 4th at 537. Several factors played into the court's decision. First, it cited the awareness of both the homeowners' association and contractor that the ceiling contained asbestos. *See id*. Next, given the strict regulation of "renovation or demolition activity which disturbs asbestos-containing constructional materials," the court noted that it was "highly unlikely that a homeowner, on his or her own, could remove acoustical 'popcorn' ceiling containing asbestos without violating a myriad of laws." *See id*. at 538. Conversely, a homeowner could, on her own, purchase and apply pesticides at her home to

11

kill insects. *See id*. at 537-38. In addition, the court considered the spread of the asbestos—which "instantly became a health hazard" upon release—throughout the building and surrounding grounds, parking lots, and street. *Id*. at 540. Taken together, the court held, "the release of asbestos here would comport with the common understanding of the word 'pollute.'" *Id*.

Again, the matter at hand parallels *Villa Los Alamos*. Vargas alleges that CalRecycle and the contractors, including Ceres, knew that the debris was hazardous and that airborne toxins were a concern, as indicated by the decontamination zones, air monitoring stations, and workers who wore protective equipment. *See* Vargas Compl. ¶¶ 15-16, 18. That last detail is particularly important. Since workers were provided protective equipment and required to wear it while handling the debris to avoid exposure to any dust, a reasonable layperson would consider the activities that released that dust as hazardous.

Vargas's complaint also alleges that the cleanup effort was subject to "regulations to ensure appropriate worker protections," including one aimed at preventing "atmospheric contamination." *See* Vargas Compl. ¶ 30 (citing Cal. Code Regs. tit. 8, § 5144). Moreover, like the asbestos in *Villa Los Alamos*, the efforts to prevent workers' exposure to the dust—again, as shown by the protective equipment and air monitoring stations—indicates that there was no safe level of exposure to the toxic dust. *Id*. ¶¶ 15-16; *see also* 198 Cal. App. 4th at 540. And, as I have already explained, the workers' actions spread the dust—not only in and around Vargas's truck at the work site, but also to the disposal location. *See* Vargas Compl. ¶ 23.

Taking all of this into account, a reasonable layperson would understand that the release of toxic dust clouds during the removal of debris left behind by a wildfire was an act of pollution rather than an ordinary act of negligence involving toxic chemicals. Releasing toxic dust during a massive cleanup effort is not the same as spraying pesticides around an apartment building to kill yellow jackets. It is more akin to the silica dust that was an "incidental byproduct" of the industrial operation in *Garamendi*, the dust and odor that spread to other properties in *Cold Creek*, and the asbestos that was released in *Villa Los Alamos*—all of which were deemed acts of pollution falling within pollution exclusions. *See Garamendi*, 127 Cal. App. 4th at 486; *Cold Creek,* 156 Cal. App. 4th at 1471; *Villa Los Alamos*, 198 Cal. App. 4th at 540.

Ingram makes two additional arguments that merit brief attention. First, it contends that the pollution exclusion does not apply to toxic exposure in the workplace. *See* Ingram MSJ at 16:10-17:17. *Garamendi* appears to foreclose this. Although the procedural posture differed in *Garamendi*—it focused on applications for orders to show cause why the insurance claims should not be allowed, not summary judgment—the court took no issue with the alleged injuries arising from the underlying plaintiffs' exposure to silica dust "at and throughout their employment." *See* 127 Cal. App. 4th at 483-84. Ingram cites no California authority countering *Garamendi*.

Next, Ingram argues that the pollution exclusion does not apply to toxic exposure that occurs during the remediation of hazardous substances. Ingram MSJ at 17:19-18:20. It relies solely on a case from Louisiana in making this point. *See id*. But Ingram overreads that decision as it relates to the pollution exclusion. The court held that because the plaintiff was injured "by entering the area" where chemicals were contained, and because those chemicals had not been discharged, dispersed, or released, or otherwise escaped, a pollution exclusion did not apply. *See Sandbom v. BASF Wyandotte, Corp.*, 674 So. 2d 349, 363-64 (La. Ct. App. 1996). It did not, as Ingram asserts, declare that pollution exclusions did not apply to cleanup efforts. And in any case, a state court decision from Louisiana is not binding here.

Wesco has shown that the underlying claim cannot fall within the policy coverage because the alleged acts giving rise to Vargas's injury—the release of toxic dust—constitute environmental pollution under *MacKinnon* and its progeny. Ingram has failed to show a potential for coverage—i.e., that this was an ordinary act of negligence. Under *Montrose*, Wesco has met its burden. *See* 6 Cal. 4th at 300. Ingram has not.

Wesco's motion for summary judgment is GRANTED and Ingram's is DENIED. The toxic dust is a pollutant as defined by the policy and was released when the workers loaded the debris into Vargas's truck. Beyond dictionary definitions and the case law, a reasonable layperson would understand that the release of toxic dust during the removal of debris left behind by a wildfire was environmental pollution. The pollution exclusion therefore applies. Wesco does not owe Ingram a duty to defend in the underlying action.

**CONCLUSION**

Judgment shall be entered in favor of Wesco and against Ingram in accordance with this Order.

**IT IS SO ORDERED.**

Dated: June 15, 2022



William H. Orrick
United States District Judge